

COURT OF APPEALS
EIGHTH DISTRICT OF TEXAS
EL PASO, TEXAS

| | | |
|---|---|---|
| IN THE INTEREST OF: | § | No. 08-24-00079-CV |
| S.R.,[1] | § | Appeal from the |
| A Child. | § | County Court at Law No. 5 |
| | § | of El Paso County, Texas |
| | § | (TC# 2022DCM6598) |

## MEMORANDUM OPINION

S.R. is two years old. She has been in the custody and care of Appellees M.S. and B.S. since she was four weeks old. M.S. and B.S. filed this suit to terminate the parental rights of Appellants A.R. (the child's mother) and C.R. (the child's father) based on endangerment and abandonment and to adopt S.R. After a bench trial, the trial court terminated both parents' rights based solely on abandonment. Both parents appealed the termination order, but only A.R. filed a brief. For the reasons explained below, we dismiss for want of jurisdiction.

## I. FACTUAL AND PROCEDURAL BACKGROUND

S.R. was born on August 4, 2022. A.R. was 21 years old and C.R. was 18 at the time. They were not married and not living together. It is not disputed that C.R. is S.R.'s father, but his name is not on the birth certificate.

---

[1] We use the parties' initials to protect their privacy. *See* Tex. Fam. Code Ann. § 109.002(d); Tex. R. App. P. 9.8(b).

## A. First CPS visit

Shortly after S.R. was born, Child Protective Services (CPS) visited A.R. at the hospital. A.R. attributes the visit to two incidents. The first occurred after she delivered, when the nurses urged her to feed S.R. but she was over-exhausted. The second occurred when she was bonding with S.R.—awake and "just there looking at her"—and a nurse expressed concern about her "sleeping with your—with your daughter on the side." These events resulted in A.R. being interviewed by a CPS worker, a psychologist, and two more CPS workers. A.R. told them "everything is fine," and, as A.R. puts it, "sure enough they just said, No, she's fine. She can take her daughter home. And that was it."

## B. Second CPS visit

CPS reentered the picture on August 9, 2022, when S.R. was five days old, after the following incident. At the time, A.R. and S.R. were staying with A.R.'s parents. According to A.R., C.R. came over to visit, but A.R.'s mother said not to open the door, trying to make him feel unwelcome. When C.R. was finally let in, he and A.R.'s mother began to argue. C.R. decided to leave, but A.R. blocked the door, pleading with him to stay and settle the matter like a family. In contrast, C.R. recalls that he had come to visit and wanted to take S.R. to Walmart, but A.R.'s mother said he could not take the baby to Walmart and blocked the door. Either way, with the door blocked, C.R. decided to leave by climbing down from a balcony while A.R., fearing for his safety, tried to stop him. C.R. says when he tried to shake A.R. off his leg, it looked like he kicked her. A.R. says he did kick her, but it was an accident. According to A.R., her mother "g[ot] all frantic" and told A.R.'s father to call the police.[2] C.R. left the home and A.R. followed him. According to C.R., they spoke behind a nearby school building, "reassess[ing] everything . . . talking of how

---

[2] According to C.R., the police were in fact called and showed up, but "couldn't do anything" so they called CPS.

everything was laid out," and he asked her, "[w]hy is your mom doing that?"

Later that day, CPS came to the home. Inez Quiroz, A.R.'s kindergarten teacher and a close family friend,[3] was also there. A.R. had called Quiroz on the phone while her mother and C.R. were arguing, and Quiroz had tried to calm them. A.R.'s parents' pastors, M.S. and B.S., were also there. A.R.'s mother had called them earlier, telling them there was a fight and asking for their help. CPS spoke with A.R.'s parents, Quiroz, M.S., and B.S. According to B.S., CPS became concerned when they asked A.R.'s mother if the baby had enough food and diapers and she told them "someone comes in the middle of the night and takes all the clothes."

Neither A.R. nor C.R. met with CPS on August 9. According to B.S., A.R. and C.R. were gone from early in the morning after the balcony incident until 10 or 10:30 at night, when M.S. and B.S. tracked them down at Dunkin' Donuts and drove A.R. back home. In contrast, A.R. maintains she and C.R. left the home around 3 or 4 p.m. and she was picked up at Dunkin' Donuts around 6 p.m.

## C. First CPS safety plan

CPS scheduled a family meeting for August 22, 2022. C.R. attended by phone but at some point became upset and hung up. A.R.'s mother and father attended in person, but A.R.'s mother— as Quiroz described it—"really went into anger" and was escorted out of the building, followed by her husband.[4] Only A.R., Quiroz, and CPS remained. The meeting resulted in the creation of a safety plan, which stated that "there are worries reference mental health and possible

---

[3] A.R. had lived with Quiroz for a while in the past because she was not getting along with her mother, and during A.R.'s pregnancy, Quiroz had taken her to doctor appointments for the same reason.

[4] Quiroz further explained that A.R.'s mother had entered the meeting holding the baby, and when CPS asked her to hand the baby to A.R., she had resisted and acted protectively towards the baby to such a degree that CPS found it alarming. Quiroz was not asked exactly what happened next, but she did state that in addition to being escorted from the building, A.R.'s mother was told by CPS that the baby would not go back to her house until she got a mental health evaluation.

developmental worries with [A.R.] that may inhibit her parental ability," and provided that A.R. and S.R. would reside with Quiroz:

> Family friend [Quiroz] has agreed to have [A.R.] and [S.R.] under her supervision 24 hours a day pending daycare services. She agrees to allow [A.R.] and [S.R.] to reside in her home. Family friend [B.S.] will assist with supervision while daycare is implemented. This will be around four hours a day while [Quiroz] is at work.

According to Quiroz, while A.R. and S.R. stayed with her, A.R. only "somewhat" took care of the baby and was "stressed out in talking to C.R. the whole time on the phone." These conversations involved "a lot of yelling." According to B.S., A.R. acted similarly at her home when the baby was there: "[A.R.] was just consumed with [C.R.] constantly and she was just yelling and screaming on the phone with him all the time." A.R. agreed she frequently spoke with C.R. on the phone, but disagreed she was inattentive to S.R.

### D. Second CPS safety plan

In or around early September 2022, C.R. was offered a job in North Dakota. According to A.R. and C.R., CPS initially agreed they could move to North Dakota with S.R. and participate in services there but then CPS suddenly changed its mind and said S.R. could not leave Texas. A.R. describes what happened as follows:

> I was speaking to [CPS caseworker] Sandra, and I told her . . . we're going to be moving, and she said, Oh, okay. When? Where? And I discussed it with her. I just told her that we're going to be going to North Dakota, and is it possible that we can do our [parenting] classes there and take our daughter with us up there. Because we're going to still stick to our words and do the classes so we can just, you know, get this squared away and stuff. She's like, No, that's not a problem. Yes, you can do them. And this was a conversation between me and her. And so far—the next day after I get married,[5] all of a sudden, Kimberly and Sandra walk into [Quiroz's] place and they start acting different and telling me that, Oh, you're not able to take your daughter out of state. I'm like, What? Hold on a second. You just told me that I have the right. That me and my husband can take my daughter up there and continue to proceed the classes and to get them done, resolved. And I remember Sandra . . . said, Oh, no, you can't because she belongs in the State of Texas, and I was like, I didn't know she was under the State.

---

[5] A.R. and C.R. got married on September 12, 2022.

C.R. similarly recounts that:

[W]hen I had communicated with CPS about telling them that I wanted to move services up there with North Dakota, they had agreed. They even had the address and everything of where the exact location I was going to be moving to. And they said they were going to proceed to services to doing that, but then when I told them that it was very soon that I was doing it, that's when the plans ended up changing. Especially when [M.S., B.S., and Quiroz] had found out [about the move] . . . . [W]hen I told [CPS] . . . how soon it was, they said that they were going to have the airport police stop us.

Quiroz and B.S. both agreed that "CPS said no" to S.R. going to North Dakota.

On September 13, 2022, a second safety plan was created, which stated there were concerns that "[A.R.] and [C.R.] engaged in domestic violence," "[C.R.] is using illegal substances," and "[A.R.] is a new mother and working on being more attentive to infant,"[6] and provided that A.R. and S.R. would continue to reside with Quiroz with a number of additional restrictions:

[S.R. and A.R.] will continue to live/stay with [Quiroz] unti[l] further notice. [A.R.] is to be supervised at all time with [S.R.]. [S.R.] may not leave the state. [C.R.] may not have any contact with [S.R.] until further notice. Maternal grandmother [] may not have any contact with [S.R.] until further notice. If [C.R.] shows up to [Quiroz's] home the police is to be notified. [A.R.] will notify [Quiroz] when she is scheduled to meet [C.R.] and ensure Mr. Quiroz is home when [A.R.] meets with [C.R.]. [A.R.] is to return home within 3 hours to feed and care for [S.R.].

A.R. says she was pressured by CPS to sign the plan and so she "just put initials" rather than her full signature to show that she "wasn't agreeing all the way."

E.    The move to North Dakota

Sometime between September 13 and 16, 2022, A.R. and C.R. left for North Dakota. A.R. explained they "already had the tickets," and "d[id]n't know what to do, so we had to leave up there." In addition, A.R. says she told Quiroz, "please take care of [S.R.]" and "[w]e will be back," and texted CPS caseworker Kimberly, "Hey, just to notify you that we are not abandoning our

---

[6]  The record reflects no evidence of domestic violence between A.R. and C.R. other than the "kick" during the balcony incident, and no evidence of drug use by C.R. other than past use in high school.

daughter, but we will be back," or something like that.[7]

According to B.S., after A.R. and C.R. left, "A.R. would contact [B.S.] every day and talk for—just about [C.R.] and what was going on," and while A.R. did not "ask how the baby was," she "would always end with saying, 'Tell [S.R.] I love her.'" In contrast, A.R. claims that "I didn't just say that I loved my daughter. I asked for the well-being of my daughter. I was asking how was her health."

On October 18, 2022, CPS mailed a letter to C.R. in North Dakota stating that it was making a "Reason to Believe" finding against A.R. and C.R. for "Neglectful Supv." and "We have offered services to your family to address safety and risk concerns identified during the investigation. Your family may continue to be involved with [CPS] and assigned an ongoing services caseworker."[8]

F.    The return to El Paso

According to A.R. and C.R., at some point while they were in North Dakota, they received a letter from CPS stating that their case was being closed and they could pick up S.R.[9] So they saved up for Greyhound tickets and made the bus trip back to El Paso. They arrived in El Paso on December 7, 2022, almost a week shy of three months after they left for North Dakota. When they stepped off the bus—before even retrieving their luggage—A.R. and C.R. were served with this lawsuit, in which a temporary restraining order (TRO) had already been entered prohibiting them from removing S.R. from the possession of M.S. and B.S.

---

[7] This testimony is undisputed. And while B.S. testified that A.R. never expressed to her an intent to return, B.S. did not testify about what A.R. said or did not say to Quiroz or CPS.

[8] When asked whether he reached out to CPS to set up services in North Dakota, C.R. answered that he did so "[t]he first day when we proceeded to North Dakota," but "they [CPS] said that it could not be done because we were already up there." A.R. stated that while in North Dakota she participated in parenting classes online on her phone, apparently at her own initiative.

[9] This letter is not included in the record, and only A.R. and C.R. testified to its contents.

**G. Proceedings in the trial court**

This suit to terminate A.R. and C.R.'s parental rights and adopt S.R. was filed by M.S. and B.S. on November 14, 2022, approximately two months after A.R. and C.R. left for North Dakota. B.S.'s supporting affidavit avers that following the CPS meeting on August 22, 2022:

> The parents did not engage in services and within a week, [A.R.] began to spend little time with the child, leaving us with actual control and possession of the child. The mother told us on the 13th of September that she was going to leave the state. On or about September 13, 2022, the mother left the state to be with [C.R.]. We have had actual control and possession of the child since late August, 2022. The mother has not seen the child since September 13, 2022.

> The abandonment of the child by the mother, her unstable mental health, her violent relationship with the alleged father, and her failure to obtain suitable training and guidance created a serious risk of danger to the child.

On November 23, 2022, the TRO was issued, as noted above. In addition to prohibiting A.R. and C.R. from, among other things, removing S.R. from the possession of M.S. and B.S., the TRO required A.R. and C.R. to appear for a hearing on December 12, 2022. That hearing was continued at A.R. and C.R.'s request.

On January 20, 2023, the trial court held a hearing. On January 27, 2023, the trial court entered temporary orders appointing M.S. and B.S. temporary managing conservators of S.R., and appointing A.R. and C.R. temporary possessory conservators. Further, A.R. and C.R. were specifically enjoined from removing S.R. from El Paso County for purposes of changing her residence. As to visitation, the order provided that A.R. and C.R. "shall have supervised visitation . . . at Pinnacle Social Services . . . twice a week for 1.5 hours each session as Pinnacle may be able to schedule," and further required A.R. and C.R. to "pay all visitation costs with each . . . responsible for 50% of visit costs," and "call Pinnacle to register no later than February 1, 2023." A.R. and C.R. were also ordered to pay $100/month each in child support through the State Disbursement Unit.

7

A.R. and C.R. claim to have paid at least some child support. However, they do not dispute that they never visited S.R. through Pinnacle, although they claim they made efforts to initiate the process. A.R. also claims that "[her] schedule never [allowed her] the chance to visit" because she was "[b]usy working." She worked "perhaps" 20 hours a week at IHOP, a job that lasted seven months, from December 2022 to July 2023. The last time A.R. had physical contact with S.R. was in mid-September of 2022, when S.R. was about six weeks old. The last time C.R. had physical contact with S.R. was on August 12, 2022, when she was eight days old.

A bench trial was held on March 11 and 13, 2024. On March 21, 2024, the trial court signed an "Order Terminating Parental Rights." This order terminated the parental rights of A.R. and C.R. based on the sole ground of abandonment, that is, on a finding there was clear and convincing evidence that A.R. and C.R. each:

> as described in Section 161.001(b)(1)(B) of the Texas Family Code, voluntarily left the child alone or in the possession of another person who is not the parent, without expressing an intent to return and without providing for adequate support of the child, and remained away for at least three months.

The order also stated the trial court "will consider the Petition for Adoption at a later date." On April 4, 2024, A.R. and C.R. filed a notice of appeal.

On appeal, A.R. raises a single issue challenging the sufficiency of the evidence to support termination of her parental rights based on abandonment. She argues that a finding of abandonment is "[ab]surd and untrue, which the real matter of why [S.R.] was left behind was CPS put false claims and controlling us and lying to us," and "[and our] thinking we had the right to go with permission up to N[orth] D[akota] with [our] daughter [S.R.], and last min[ute CPS] saying that we can't . . . . [S.R.] was never to be left behind." (emphasis omitted).

## II. APPLICABLE LAW AND STANDARD OF REVIEW

A parent's "right to the companionship, care, custody, and management of his or her

children is an interest far more precious than any property right." *In re A.C.*, 560 S.W.3d 624, 629–30 (Tex. 2018) (citing *Santosky v. Kramer*, 455 U.S. 745, 758–59 (1982)); s*ee also Santosky* at 759 ("When the State initiates a parental rights termination proceeding, it seeks not merely to infringe [a] fundamental liberty interest, but to end it"; "If the State prevails, it will have worked a unique kind of deprivation . . . . A parent's interest in the accuracy and justice of the decision to terminate his or her parental status is, therefore, a commanding one.") (internal quotation marks omitted). However, a parent's rights and interests are not absolute, and "[j]ust as it is imperative for courts to recognize the constitutional underpinnings of the parent–child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *A.C.*, 560 S.W.3d at 630.

Texas Family Code § 161.001 "balances the convergent and divergent interests of parent and child" by permitting termination of a parent–child relationship only if (1) the parent's conduct satisfies at least one statutory ground for termination, and (2) termination is in the best interest of the child. *Id.* Further protecting a parent and child's shared "commanding" and "fundamental" interest in their relationship, each element requires clear and convincing evidence. *Id.*

Evidence is clear and convincing if it is of "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007. This intermediate standard falls between the preponderance-of-the-evidence standard generally used in civil cases and the beyond-a-reasonable-doubt standard used in criminal cases. *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979); *In re A.B.B.*, 482 S.W.3d 135, 139 (Tex. App.—El Paso 2015, pet. dism'd w.o.j.). A single ground under Texas Family Code § 161.001(b)(1)(A)–(V) is sufficient to uphold termination of a parent's rights. *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019).

To terminate parental rights based on abandonment under paragraph (B), a fact-finder must

9

find that the parent "voluntarily left the child alone or in the possession of another not the parent without expressing an intent to return, without providing for the adequate support of the child, and remained away for a period of at least three months." Tex. Fam. Code Ann. § 161.001(b)(1)(B).

When the legal sufficiency of the evidence is challenged in a termination of parental rights case, reviewing courts consider all the evidence in the light most favorable to the required finding to "determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We defer to the fact-finder's conclusions, indulge every reasonable inference supporting the finding, and presume the fact-finder resolved any disputed facts in favor of the findings. *In re L.D.C.*, 622 S.W.3d 63, 69 (Tex. App.—El Paso 2020, no pet.). While we may not disregard undisputed facts, we disregard any evidence that a reasonable fact-finder could have disbelieved or found to be incredible. *Id*.

Likewise, in reviewing the trial court's findings for factual sufficiency, the reviewing court looks to whether the evidence is such that the fact-finder could reasonably form a firm belief or conviction about the truth of the allegations. *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "Importantly, we must not substitute our judgment for that of the factfinder." *In re D.R.V.*, No. 08-22-00238-CV, 2023 WL 2544577, at *5 (Tex. App.—El Paso Mar. 16, 2023, no pet.) (mem. op.). We must give due consideration to evidence that the fact-finder reasonably could have found to be clear and convincing. *In re J.F.C.*, 96 S.W.3d at 266. We also "consider whether disputed evidence is such that a reasonable factfinder could not have resolved that disputed evidence in favor of its finding." *Id*. The evidence is factually insufficient when, in light of the entire record, the disputed evidence that a reasonable fact-finder could not have credited in favor of the finding is so significant that a fact-finder could not reasonably have formed a firm belief or conviction. *Id*.

## III.  DISCUSSION

Before reaching the merits of an appeal, we must first inquire into our own jurisdiction.

10

*Matter of Estate of Lindsay*, 538 S.W.3d 759, 761 (Tex. App.—El Paso 2017, no pet.). Without jurisdiction, we have no power to address the merits; accordingly, we must determine whether we have jurisdiction even when the parties do not raise the issue. *Matter of Estate of Fenenbock*, No. 08-23-00146-CV, 2024 WL 1340564, at *3 (Tex. App.—El Paso Mar. 28, 2024, no pet.) (mem. op.); *see also In Matter of Estate of Romo*, 469 S.W.3d 260, 262 (Tex. App.—El Paso 2015, no pet.) ("[W]e must consider our jurisdiction, even if that consideration is sua sponte.") (quoting *Freedom Commc'ns, Inc. v. Coronado*, 372 S.W.3d 621, 624 (Tex. 2012)); *Rattray v. City of Brownsville*, 662 S.W.3d 860, 868 (Tex. 2023) (recognizing that a "court may not reach the merits if it finds a single valid basis to defeat jurisdiction").

The order appealed here—the "Order Terminating Parental Rights" signed by the trial court on March 21, 2024—does not dispose of M.S. and B.S.'s request for adoption, and instead states that "The Court will consider the Petition for Adoption at a later date."[10]

In suits affecting the parent-child relationship, we have jurisdiction over final orders. *See* Tex. Fam. Code § 109.002(b). An order is final when it "disposes of all issues and all parties." *In re R.R.K.*, 590 S.W.3d 535, 540 (Tex. 2019) (*citing Lehmann v. Har-Con Corp.*, 39 S.W.3d 191, 195 (Tex. 2001)). The order at issue here expressly states that it does not dispose of M.S. and B.S.'s request for adoption. Consequently, this order is not final and we lack jurisdiction to review its merits at this time. *See In re J.R.W.*, No. A14-90-00760-CV, 1991 WL 84058, at *1 (Tex. App.—Houston [14th Dist.] May 23, 1991, no writ) (not designated for publication) ("[T]he decree terminating . . . parental rights is . . . an interlocutory order, given that the instant action is a suit for termination of parental rights and adoption. While the joinder of such suits is authorized

---

[10] After entering the "Order Terminating Parental Rights," the trial court entered an order appointing an adoption evaluator. This appointment order—which was signed on April 8, 2024, and required completion of the evaluation by May 22, 2024—is the most recent order in the record before us.

by the Family Code, the termination proceeding was not severed from the adoption proceeding and, thus, the termination decree did not fully dispose of all legal issues and all rights between the parties."); *In re Martinez*, No. 04-98-00212-CV, 1999 WL 102202, at *1 (Tex. App.—San Antonio Feb. 26, 1999, no pet.) (per curiam) (not designated for publication) (order terminating parental rights not appealable because adoption request remained pending).

## IV. CONCLUSION

We therefore dismiss this appeal for want of jurisdiction. Until a final, appealable order is issued, A.R. and C.R. must continue to be served in the trial court in accordance with Texas Rules of Civil Procedure 21 and 21a.

LISA J. SOTO, Justice

September 4, 2024

Before Alley, C.J., Palafox, and Soto, JJ.

12